UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

**Christopher Bibbo**, Plaintiff,

v.

**Massachusetts Department of Correction**; et al., Defendants

Civil Action

08−CV−10746−RWZ

---

### PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT[1]

## I.  MR. BIBBO HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES

The Prison Litigation Reform Act (PLRA) requires prisoners to exhaust "such administrative remedies as are available" before bringing suit regarding prison conditions, 42 U.S.C. § 1997e(a).  However, the exhaustion requirement is not jurisdictional, but rather "an affirmative defense [that] . . . defendants have the burden of pleading and proving. . . [and] may be subject to certain defenses such as waiver, estoppel, or equitable tolling." *Casanova v. Dubois*, 304 F.3d 75, 78 n. 3 (1st Cir. 2002); *see also Dantone v. Bhaddi*, 570 F.Supp.2d 167, 172 (D.Mass. 2008); *Wigfall v. Duval*, No. 00-12274, 2006 WL 2381285, *2 (D.Mass. 2006).

Mr. Bibbo has flawlessly exhausted his administrative remedies as to his claim that defendants violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, by refusing to allow him to use his electric wheelchair so that he can access the prison's facilities and benefits.  With regard to his claims that defendants violated the ADA and the RA by failing to provide him an orientation like

---

[1] With this opposition, Mr. Bibbo has simultaneously filed a motion Fed. R. Civ. P 56(f) for an Order denying this motion to the extent it is seeking summary judgment because it is premature given the procedural posture of this case.  Specifically, Defendants have not filed an Answer responding to the allegations of the compliant, the discovery period is not set to expire until 90 days after Defendants file an Answer, and as Mr. Bibbo motion more fully ex-

non-disabled inmates receive and by discriminating against him in job assignments, if Mr. Bibbo has failed to technically follow every requirement of defendants' grievance procedures, his failure is excused by defendants' own prior failure to explain prison grievance procedures to him as those same procedures require them to do at a prison orientation.

> **A.   With regard to his claim of having been deprived of the use of his personal electric wheelchairs, Mr. Bibbo has flawlessly exhausted every grievance procedure available to him.**

> **1.   Mr. Bibbo has pursued the administrative grievance process to completion.**

To properly exhaust administrative remedies, prisoners must "complete the administrative review process in accordance with the applicable procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S.Ct. 2378, 2384 (2006).  The Department of Corrections (DOC), through its regulations, has established two mutually exclusive grievance processes: one for grievances that do not concern an inmate's physical or mental condition ("the § 491.00 grievance procedure"), *see* 103 C.M.R. 491.00, and another — a multi-level appeal process with final review resting with the DOC — for grievances that do relate to an inmate's physical or mental condition ("the § 12.00 grievance procedure."). *See* 103 C.M.R. § 491.08(1) stating that:

> medical or clinical decisions related to an inmate's physical or mental condition shall not be grievable under 103 CMR 491.00 as the medical contractor is required to maintain its own grievance procedure.

The regulations setting out the § 12.00 grievance procedure are attached as Ex. 9 to Mr. Bibbo's affidavit.[2]  This procedure was approved by the DOC through its employee, Terre K. Marshall, as the "Reviewing Authority" for the DOC's Health Services Division. (Bibbo Aff.,

---

plains, he will be prejudiced if he is required to respond to facts in the context of a summary judgment motion when he has not had a sufficient opportunity to conduct discovery regarding them.

Ex. 9, at 1).   The § 12.00 grievance procedure requires an inmate to initially file a grievance with UMCH and then appeal the UMCH's decision for final review to the DOC.   "The appeal process is managed by the Department of Correction Health Services Division" and '[a]n inmate may choose to file a formal appeal about healthcare related concerns only after dissatisfaction with a UMCH response to a formal grievance." (*Id.*, § 12.00(4)(a), (b)).

Mr. Bibbo followed the Section 12.00 grievance procedure to exhaustion.   On Jan 7, 2008, Mr. Bibbo filed a grievance under the Section 12.00 grievance procedure requesting that his electric wheelchair be serviced so that he could use it to access the prison facility in the same manner as non-disabled inmates. On Jan. 18, 2008, Mr. Sabourin of UMCH denied Mr. Bibbo grievance stating that "it was determined that when and if your [electric wheel]chair becomes unserviceable, you will be provided a new manual chair . . . [because] you only need a manual chair while incarcerated and living in the infirmary or [Assisted Daily Living (ADL) facility.". (Bibbo Aff., Ex. 4).   Mr. Bibbo received this denial on Feb. 2, 2008.   The very next day, he filed a first-level appeal, which was denied by Dyana Nickl of UMCH on Feb. 29, 2008.   Ms. Nickl stated that "a manual chair is all that is necessary based on your medical needs. Therefore, you do not meet the criteria for a motorized chair. . . . You may appeal this decision to the Massachusetts Department of Corrections, Health Services Division." (Bibbo Aff., Ex. 5)

On March 10, 2008, Mr. Bibbo appealed the UMCH decision to the DOC within the required timeframe.[3] On March 16, 2008, Terre Marshall of the DOC denied the appeal, stating:

---

[2] The § 12.00 appeal process is mutually exclusive of the grievance procedure described at 103 C.M.R. 491.00 as it states that only "legitimate complaints pertaining to medical services" are grievable.  (See Bibbo Aff., Ex. 9, § 12.00(3)(b)).
[3] Mr. Bibbo appeal to the DOC was timely made as he filed it with the thirty days specified.  (See Bibbo Aff., Ex. 9, § 12.00(4)(d)).

> [A] manual wheelchair [has been deemed] to be adequate to meet your needs. In addition . . . [the] MCI-Shirley administration has arranged for you to have an inmate assistant who will push your wheelchair for you to areas of the facility that you need to access. . . It appears that the UMCH and the Department of Corrections are offering you appropriate health care and access to services, as needed.  Therefore, I am upholding the decision of the UMCH grievance coordinator.

(Bibbo Aff., Ex. 6).

The regulations confirm that Mr. Bibbo had no further appeals available to him. What is more, Mr. Bibbo was explicitly told so in writing and warned not to attempt any more grievances or he would lose all of his grievance privileges.   Specifically, after the DOC denied Mr. Bibbo's appeal regarding his electric wheelchair, he wrote directly to a doctor in the prison, Dr. Angeles, asking her to review his previous medical records from other doctors stating that he needed an electric wheelchair, and to please help him stop Scott Anderson of the DOC from "tak[ing] away [his] wheelchair." (See Bibbo Aff., Ex. 7).  The letter was forwarded to Dyana Nickl, who responded by letter on June 24, 2008.  Her letter stated:

> I am in receipt of your letter dated 6/13/2008.  It was forwarded to me by Dr. Angeles.  Your letter addresses the issue of your wheelchair. <u>This issue has previously been addressed through the grievance and appeal process. The response you received dated 4/16/08 from Terre Marshall, Director of DOC Health Services Division completed the grievance process. Her decision is considered final</u>.
>
> You have already been informed that you will be provided a manual wheelchair and an assigned pusher when needed. This concludes this issue.  <u>Continued attempts to address this issue may result in suspension of grievance privileges.</u>

(Bibbo Aff., Ex. 8) (Emphasis added).  Thus, it is clear that Mr. Bibbo has exhausted the available administrative remedies regarding his wheelchair claim as required by the PLRA.

### 2.      Mr. Bibbo could not have used any other grievance process

Defendants in their motion papers have not provided the Court with Mr. Bibbo's grievances and appeals described above or the DOC's March 16, 2008 final denial of the grievance upholding the determination that "a manual wheelchair [was adequate to meet Mr. Bibbo's] needs and that the UMCH and the Department of Corrections [we]re offering [Mr. Bibbo] appropriate health care and access to services, as needed."  It is unclear whether in doing so Defendants are arguing that Mr. Bibbo should had used the other grievance process — the 491.00 process — or that the grievance process Mr. Bibbo used (that was specifically approved by the DOC) somehow does not count against the DOC because the grievance process required that it be initiated through a grievance to the UMCH before it could be brought to the DOC for final review.  Both arguments are meritless.

Defendants cannot argue that Mr. Bibbo should have used the § 491.00 grievance procedure because the DOC's own regulations, 103 C.M.R. § 491.08(1), explicitly state that "medical or clinical decisions related to an inmate's physical or mental condition shall not be grievable under 103 C.M.R. 491.00 as the medical contractor is required to maintain its own grievance procedure."  When Mr. Bibbo filed his grievances and appeals, the DOC (as well as the UMCH) confirmed that Mr. Bibbo's grievances were filed in the correct forum by responding to them on the merits, instead of rejecting them for being improperly filed.  See the sample "Department of Corrections Inmate Medical Grievance and Appeal Form" (attached to the § 12.00 grievance procedures) which contains a checkbox for rejected grievances labeled "Issue is not within the control of Health Services and must be addressed with DOC." Bibbo Aff., Ex. 9, at 5; *see also* §§ 12.00(3)(e–g) stating that "[p]roperly executed grievances will be forwarded to UMCH's Central Office for investigation and response. . . . Once the grievance has been received by

UMCH's Central Office, a response will be sent to the inmate within 30 working days. . . . A copy of the grievance and UMCH' response will be sent to DOC HSD.")

Having accepted and reviewed Mr. Bibbo's appeal of his grievance initiated under the § 12.00 grievance procedure, the DOC cannot now argue that it was the improper forum to address his concern. *See Shaheed-Muhammad v. Dipaolo*, 393 F.Supp.2d 80, 97 (D. Mass. 2005) (denying prison officials' motion for summary judgment on exhaustion grounds, because "if defendants believed that plaintiff's grievances were filed in an improper format or failed to comply in some other way, they were obligated to return the grievances to him. . . . Having failed to abide by the strictures of their own regulations, defendants should not be allowed to claim plaintiff's noncompliance as a bar [under the PLRA].").[4]

This is particularly true where the Defendants also specifically told Mr. Bibbo that he should file his electric-wheelchair related complaints using the § 12.00 grievance process.  See Anderson Aff., filed in support of the instant motion (Dkt. No. 61) at ¶ 26 ("On numerous occasions I have informed the plaintiff himself verbally . . . that the contracted medical provider is responsible for making the determination as to what type of wheelchair is medically necessary . . ."); Bibbo Aff., ¶ 14 ("Scott Anderson of the Department of Correction and Kevin Sabourin of University Massachusetts Correctional Health (UMCH) both individually told me that if I had a complaint about my electric wheelchair that I needed to file a grievance first with the UMCH which would eventually go for final review to Department of Correction officials.").[5]  In fact,

---

[4] Similarly, Defendants cannot argue that Mr. Bibbo should have tried to raise the issue again given that he was told in writing that he had exhausted his remedies regarding this issue and was told to stop requesting relief or his attempts to reargue the claim "might result in suspension of grievance privileges."

[5] There is no question that the DOC interprets the phrase "medical or clinical decisions related to an inmate's physical or mental condition" to include the question of whether Mr. Bibbo's electric wheelchair should be taken away from him. The DOC has told the court this many times, *see* Opp. to the Motion for a TRO (Dkt. No. 29, at 5) ("Nei-

Defendants' Statement of Facts (Dkt. No. 59) at ¶ 45 specifically states that "the decision as to what type of medical equipment, including wheelchairs, is necessary for a particular inmate is up to the medical provider."

Similarly, Defendants cannot argue that Mr. Bibbo's properly filed grievance and appeal to the DOC through the § 12.00 grievance procedure somehow cannot count as exhaustion of Mr. Bibbo claim against the Defendants.  As discussed above, the DOC regulations require any grievance related "to an inmate's physical or mental condition" to be routed first through the UMCH before it is can be appealed for final review to the DOC.  Requiring a grievance to be routed as such cannot render the DOC's **final decision** of the issue non-reviewable by a court. The PLRA requires exhaustion so "that an agency [has] the opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."  *Beatty v. Goord*, 2000 WL 288358, at *1 (S.D.N.Y. 2000).  Under the § 12.00 grievance procedure, the DOC is the final decision maker for the grievance presented and, in this case, the DOC reviewed the issue presently before the Court and specifically determined that the "UMCH and the Department of Corrections [we]re offering [Mr. Bibbo] appropriate health care and access to services, as needed."  The DOC specifically held that this was so because the "MCI-Shirley administration has arranged for [Mr. Bibbo] to have an inmate assistant who will push [his manual] wheelchair . . . to areas of the facility that [he] need[s] to access."  The DOC cannot now complain that Mr. Bibbo did not give it the opportunity to review his claim that the Defendants' failure to allow him to use an electric wheelchair violates the ADA and RA because he cannot inde-

---

ther the Department, nor its employees, is responsible for making medical decisions as to an inmate's medical care and treatment[,] . . . [and thus] Defendants . . . are [not] responsible . . . for making a determination as to whether Plaintiff should be equipped with an electric wheelchair versus a manual one."); Motion to Reconsider the TRO,

pendently access the prison's facilities and benefits that are otherwise available to non-disabled inmates in a manual wheelchair.

**3.** <u>Mr. Bibbo's use of the § 12.00 grievance procedure does not prevent him from suing the DOC</u>

Defendants seem to argue that, since Mr. Bibbo used the § 12.00 grievance procedure — the only process available to him — for his wheelchair-related grievances, he has somehow forfeited his right to bring a claim under the ADA and RA against the Defendants for their failure to allow him access to the prison's facilities and benefits that are available to non-disabled inmates. There is no support in the caselaw for such a position.

The ADA and RA require Defendants to make reasonable accommodations to "afford [Mr. Bibbo] an opportunity to participate in or benefit from . . . [prison] service[s] that is . . . equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii). Defendants argue that if they choose to treat the type of wheelchair that Mr. Bibbo uses as also being a medical decision, they are somehow relieved from complying with these federal statutes. This defies common sense and is contrary to the clear intent of Congress in enacting the ADA and RA. *See Pennsylvania Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 209 (1998) ("[T]he ADA . . . unmistakably includes State prisons and prisoners within its coverage.").

Under the ADA and RA, the DOC has a legal duty to reasonably accommodate Mr. Bibbo's disability. That duty may not be delegated away. *See, e.g.*, *Botosan v. Paul McNally Realty*, 216 F.3d 827, 833 (9th Cir. 2000) (In the related ADA Title III context, "a landlord has an independent obligation to comply with the ADA that may not be eliminated by contract [such as a lease]."); *Frotton v. Barkan*, 219 F.R.D. 31, 31 (D.Mass. 2003) (same) (citing *Batosan*); *Susav-*

---

(Dkt. No. 36, at 13) (same); and TRO Hearing Transcript, at 19, ll. 1–5 ("UMCH medical staff evaluated Mr. Bibbo

*age v. Bucks County Schools Intermediate Unit No. 22*, No. 00-6217, 2002 WL 109615 at *20 (E.D.Pa. 2002) ("BCIU's argument that it delegated its duty cannot absolve it of liability under the ADA, IDEA or § 504 in this case. BCIU was the public agency responsible for Pennsylvania's compliance with federal statutory requirements[;] . . . it cannot abdicate that responsibility by delegating it to a private entity."); *Bingham v. Oregon School Activities Ass'n*, 24 F.Supp.2d 1110, 1116 (D.Or. 1998) ("I cannot accept the proposition that [public] schools can take themselves out of the reach of the ADA in the area of athletics by delegating rule-making authority [to a collective body representing many schools].").[6]

The cases Defendants cited for the contention that UMCH has sole responsibility to determine what wheelchair Mr. Bibbo may use does not address the issue presently before the Court. Instead, Defendant cite cases that concern suits under the Eighth Amendment against individual defendants.  In the Eighth-Amendment context, relief is available only against individual officers who "know[] of and disregard[] an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This is an extremely high *mens rea* standard, which requires actual "<u>subjective</u> culpability," *id.* at 843, n.8, that rises to the level of "recklessness as used in the criminal law." *Id.* at 839–40. In that context, the cases cited stand only for the unremarkable proposition that an <u>individual</u> officer is usually not <u>criminally reckless</u> in relying on a

---

on May 13th, 2008 for use of a manual wheelchair. . . . That's a medical decision.").

[6] To hold otherwise would defeat the clearly expressed purposes of the ADA and the RA. Defendants' argument — that government entities can inoculate themselves against claims under the ADA and the RA merely by subcontracting some of the relevant decisions to an outside body — is contrary to clear caselaw holding that the ADA and RA applies in the prison setting because it would leave prisoners without a remedy. Many states subcontract medical care to <u>private</u> entities rather than public ones. *See, e.g., Morgan v. Mississippi*, No. 2:07cv15, 2009 WL 1609060 at *13 (S.D.Miss. 2009) (Mississippi DOC contracts out prison healthcare to Correctional Medical Services, a private entity). Such entities are not subject to suit under the ADA and the RA. *Id.*  Thus, under Defendants' argument, <u>nobody</u> would be subject to suit for violation of the ADA and RA in those states, and inmates' rights thereunder could be violated with perfect impunity.

doctor's medical advice.[7]   Mr. Bibbo, however, has not brought an Eighth Amendment claim against the defendants in their individual capacity seeking compensatory damages. Instead, Mr. Bibbo is seeking injunctive relief under the RA and ADA against the DOC and official-capacity Defendants. Consequently, the DOC and its officers are responsible for the <u>department's actions</u> and must ensure that the prisons they run produce <u>outcomes</u> that comply with the ADA and the RA. *See Kiman v. New Hampshire Dep't of Corrs.*, No. 01-134, 2008 WL 649128 at *2 (D.N.H. 2008) ("A plaintiff may bring a reasonable accommodation claim under [ADA] Title II without proving either . . . intentional discrimination, or disparate impact."). Defendants must ensure that their prisons "afford [disabled inmates] an opportunity to participate in or benefit from . . . [prison] service[s] that is . . . equal to that afforded others," 28 C.F.R. at § 35.130(b)(1)(ii), and "make reasonable modifications. . . [so as] to avoid discrimination on the basis of [their] disability . . .," *id.* at § 35.130(b)(7). Thus, lack of <u>individual</u> <u>criminal recklessness</u> is no defense, and Defendants' cases regarding the weight of a medical opinion are inapposite.[8] See also *Stringham*

---

[7] *See Layne*, 657 F.2d at 471 ("[T]he ultimate question [in the Eighth Amendment context] is the <u>state of mind of the defendant</u>" and whether he had "actual notice of a prisoner's need for physical protection or medical care"); *Camberos v. Branstad*, 73 F.3d at 176 ("[T]he <u>personal involvement</u> required to support liability" in the Eighth Amendment context is negated for supervisors who lacked medical expertise and thus deferred to the medical staff's decisions) (emphasis added); *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977) (warden could rely on a medical report he received without violating the Eighth Amendment); *Rosen*, 811 F.Supp. at 761 (doctor's and nurse's misconduct was so bad as to "shock the conscience" and raise the possibility of an Eighth Amendment violation).

[8]   Defendants' arguments in Section III of their brief, pp. 9–10, are fatally flawed for a similar reason. Defendants argue that Mr. Bibbo has failed to properly plead his case because he has "fail[ed] to identify <u>what wrongful actions each defendant took</u> which is the subject of his Amended Complaint and for which he claims they are liable." (Defendants' Br., at 10) (emphasis added). When the underlying substantive law does not require that individual Defendants be guilty of wrongdoing (as the Eighth Amendment does, but the ADA and RA do not), then an official-capacity suit for purely injunctive relief "represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) Thus, there is no requirement to plead "what wrongful actions each defendant took"; it is only necessary to plead that the defendant is an officer of the Department whom the court may order to conform his actions to law in future, notwithstanding any Departmental or other instructions to the contrary. *Ex parte Young*, 209 U.S. 123 (1908) itself, the case that first authorized official-capacity suits, is a perfect example of this. That was a case brought against the attorney-general of a state on the ground that a law passed by the state legislature was unconstitutional. The attorney general of course had not been involved in any "wrongful actions" in making the law. Despite this lack of past wrongdoing, he was an appropriate defendant, because he could be ordered not to enforce the law <u>in future</u> (which he would otherwise be obligated to

*v. Bick*, 2007 WL 60996 (E.D.Cal. 2007) (court allowed ADA suit against prison even where a prison doctor had recommended that plaintiff's requested accommodation was unnecessary).

Even if this were not so, as a factual matter, the DOC has not delegated its duty to comply with the ADA and RA as it has retained final review of the UMCH's medical decisions. (See Bibbo Aff., Ex. 9, at § 12.00(4)(a) ("The appeal process is managed by the Department of Correction Health Services Division."); § 12.00(4)(d) ("An inmate may appeal the UMCH grievance decision to the Massachusetts Department of Correction Health Services Division . . . . Appeals must be forwarded directly to [the] Massachusetts Department of Correction, Health Services Division . . ."); § 12.00(3)(g) ("A copy of [each] grievance and UMCH's response will be sent to DOC [Health Services Division], including a copy of 'UMCH Grievance Investigation' form if part of the grievance documentation.").[9]  Because Mr. Bibbo's properly exhausted the only administrative remedies available to him regarding his electric wheelchair, he has satisfying the requirements of the PLRA as to that claim.

**B.**      **With regard to his other claims, if Mr. Bibbo has failed to strictly follow Defendants' grievance regulations, that failure is excused by defendants' own prior failure to follow those regulations when they did not explain those regulations to Mr. Bibbo at a mandatory orientation.**

The full records of Mr. Bibbo's grievances are in defendants' possession. Therefore, for purposes of this motion only, and pending discovery on this topic, Mr. Bibbo will assume arguendo that he has failed to perfectly follow DOC grievance regulations with regard to his

---

do). Indeed, such suits often proceed against the present occupant of an office, on the basis of alleged wrongdoing performed by the present occupant's predecessor in office. *Hafer*, 502 U.S. at 25  ("[W]hen officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation.")

[9]  In addition, it is not even clear from Defendants' documents whether the DOC requires UMCH medical staff to consider the effect their "medical decisions" have on inmates' ADA and RA rights—that is, whether they help or hinder them in accessing prison facilities and benefits. If not, then Defendants have created a system in which the *power* to make decisions that affect inmates ADA/RA rights resides with medical staff who have no *responsibility* for doing so in a way that complies with those statutes. Such a system facially violates both statutes.

claims arising out of: (1) Defendants' failure to provide Mr. Bibbo a mandatory prison orienta-tion because of his disability; and (2) Defendants' discrimination against Mr. Bibbo in the job-assignment process because of his disability.  Defendants, however, should be barred from rais-ing the PLRA as a defense.[10]

Massachusetts grievance regulations create two related and complementary duties. They strictly require an inmate to follow procedures and meet tight deadlines, *see, e.g.*, 103 C.M.R. § 491.08 (10-day time limit to file grievance); *id.*, § 491.12 (10-day time limit to file appeal if grievance denied); *id.*, § 491.19 (inmate may forfeit opportunity to obtain remedy if grievance not filed in time); at the same time, the regulations strive for fairness by also imposing a com-plementary duty on the authorities to give the inmate the means to comply with the regulations by explaining the grievance procedures to him at a prison orientation. *See* 103 C.M.R. § 491.05 ("[A]ll new inmate commitments and incoming inmate transfers shall be notified of Department and Institution Grievance Procedures during the inmate's orientation.") (Emphasis added).

Defendants have violated their duty under the regulations by failing to provide Mr. Bibbo with an orientation. In both his original Complaint and his Amended Complaint, Mr. Bibbo has alleged that he was not given an orientation when he entered MCI-Shirley or since, and that the grievance procedures were never explained to him. For relief, he has requested that he be given an orientation like non-disabled inmates received.  (Am. Complaint, ¶¶53–63).

Courts have repeatedly found that prison authorities' misconduct can prevent defendants from raising the PLRA's exhaustion defense (although they have not been consistent in the terms

---

[10] In the alternative, if the Court determines that Mr. Bibbo has failed to exhaust his administrative remedies regard-ing his electric wheelchair, he also believes that such failure should also be excused by Defendants' failure to pro-vide him an orientation.

they use to explain their decisions).[11]  "Having failed to abide by the strictures of their own regu-

lations, defendants should not be allowed to claim plaintiff's noncompliance as a bar." *Shaheed-*

*Muhammad*, 393 F.Supp.2d at 97.   *See also Carter v. Newland*, 441 F.Supp.2d 208, 211

(D.Mass. 2006) (declining to dismiss the suit under the PLRA, where the court held that "defen-

dants' contention that [the plaintiff] failed to exhaust administrative remedies is compromised by

the alleged government misconduct" of prison authorities who had negligently destroyed the

grievances.); *Hemphill v. New York*, 380 F.3d 680, 690–91 (2d Cir. 2004) (holding that officials'

threats to retaliate against an inmate for filing a grievance could estop them from later asserting

exhaustion under the PLRA); *Dale*, 376 F.3d at 656 ("prison employees cannot exploit the ex-

haustion requirement by not responding to grievances.") (internal citations omitted); *Kaba v.*

*Stepp*, 458 F.3d 678, 685 (7th Cir. 2006) (same); *see Powe v. Ennis*, 177 F.3d 393, 394 (5th Cir.

1999) (prison's failure to respond to grievance as required by the regulations excused any re-

quirement that he further pursue internal grievance procedures); *Goodman v. Carter*, No. 2000-

C-948, 2001 WL 755137 at *3 (N.D.Ill. 2001) ("The court will not read 42 U.S.C. § 1997e(a) . . .

to permit [prison authorities] to exploit the exhaustion requirement through indefinite delay in

responding to grievances."); *Richards v. Massachusetts Dep't. of Corr.*, No. 04-10291, 2005 WL

283203 at *1 (D.Mass. 2005) (officials' failure to provide the necessary grievance forms excuses

non-exhaustion under the PLRA, especially if the plaintiff nevertheless "attempt[s] to use the

---

[11] *See* Gray Proctor, *Ngo Excuses: Proving, Rebutting, and Excusing Failure to Exhaust Administrative Remedies in Prisoner Suits after* Woodford v. Ngo *and* Jones v. Bock, 31 Hamline L. Rev. 471, 481 (2008).  Some courts have said that such misconduct "excuses" the failure to exhaust, *see id.*; others have obtained the same result by holding that government misconduct renders administrative remedies "unavailable," and thus not subject to exhaustion under the PLRA. *See id.* But "[r]egardless of whether they claimed to be excusing exhaustion or defining it as '[un]avail-able,' courts have been in substantial agreement on when PLRA exhaustion should not apply," *id.*, a common thread being that "prison employees . . . should not be rewarded for preventing an inmate access to an administrative rem-edy" *Dale v. Lappin*, 376 F.3d 652, 656 (7th Cir. 2004).

13

grievance process by completing an unauthorized form."); *see also Mitchell v. Horn*, 318 F.3d 523, 529 (3d Cir. 2003); *Miller v. Norris*, 247 F.3d 736 (8th Cir. 2001).

Such rules are necessary to effectuate the purpose of the PLRA. The PLRA was not meant to bar legitimate claims by inmates, only frivolous ones. *See, e.g.*, 141 CONG. REC. S14,627 (daily ed. Sept. 29, 1995) (statement of Sponsor Sen. Hatch) ("I do not want to prevent inmates from raising legitimate claims. This Legislation will not prevent those claims from being raised."); 142 CONG. REC. S2219-03 (daily ed. Mar. 18, 1996). Thus, just as courts are rightly concerned that  inmates be prevented from circumventing the PLRA by deliberately "flouting," "spurning" or "bypass[ing]" grievance procedures, *see Woodford v. Ngo*, 548 U.S. at 97–98 (2006) and *Pozo v. McCaughtry*, 286 F.3d 1022, 1023–24 (7th Cir. 2002), they are also rightly concerned with preventing prison officials from using the PLRA to prevent review of legitimate claims. *See, e.g.*, *Woodford*, 548 U.S. at 102–03 (recognizing the danger that "prisons might create procedural requirements for the purpose of tripping up all but the most skillful prisoners"); *Dale*, 376 F.3d at 656 ("[P]rison employees . . . should not be rewarded for preventing an inmate access to an administrative remedy.").

Here, Mr. Bibbo has alleged that he never received an orientation, which within the context of a motion to dismiss must be taken as true.  He has requested that be given an orientation in the same manner as non-disabled inmates so that he has the same information about the prison's grievance procedures and the rules and benefits of the prison that non-disabled inmates are provided.  Defendants' argument that Mr. Bibbo's claim requesting an orientation and access to grievance procedures should be barred because he did not follow those same grievance procedures is in contravention of the PLRA's purpose and defies common sense.  It is exactly the type of conduct by prison authorities that make compliance with the PLRA exhaustion requirement

14

impossible.  As such, under the governing caselaw Mr. Bibbo has asserted sufficient facts to de-

feat Defendants' ability to establish and **prove** waiver under the PLRA.  The exhaustion require-

ment of the PLRA is "an affirmative defense [that] . . . defendants have the burden of pleading

and proving. . . [and] may be subject to certain defenses such as waiver, estoppel, or equitable

tolling." *Casanova v. Dubois*, 304 F.3d at 78 n. 3.

Defendants have also attempted to move for summary judgment on the issue by submit-

ting a single screenshot purporting to show that Mr. Bibbo was given a "DOC/Writ/Verb"-type

orientation by a "Stan Ferrebee" on May 17, 2005. (See Defendants' Ex. F to the Anderson Aff.,

Dkt No. 61-2, at 13).  Mr. Bibbo has in turn submitted an affidavit disputing this fact stating:

> [N]on-disabled inmates are assigned to the "A-1 building," which is referred to as
> the "Orientation Building," upon arrival at the prison.  Non-disabled inmates are
> housed in the Orientation Building until they attend and complete a scheduled ori-
> entation.  Failure to attend the orientation results in a disciplinary report being is-
> sued against an inmate and the inmate cannot leave the Orientation Building for
> permanent housing until they complete the orientation.  The orientation at the
> Orientation Building includes video and oral presentations by various individuals
> that can include the treasurer, a parole board officer, the job assignment officer,
> the programs director, an Inner Perimeter Security officer, and other prison offi-
> cials.  Each non-disabled inmate that attends the orientation is given an inmate
> handbook.  The orientation can sometimes last more than a day.  Once the non-
> disabled inmate completes the orientation process, the non-disabled inmate is . . .
> transferred from the A-1 building to their housing assignment.
>
> In contrast, because I am a disabled inmate requiring some medical treat-
> ment and/or services, when I entered MCI-Shirley on December 15, 2005, I was
> brought directly to the Health Ser-vices Unit (HSU) where I have been permas-
> nently housed.  The HSU does not conduct orientation programs and I never re-
> ceived an orientation regarding the prison's grievance procedures and/or informa-
> tion about the existence of various prison and educational programs available to
> inmates at the prison.  I was never brought to the Orientation Building to receive
> an orientation.

(Defendants' Statement of Disputed Facts (hereinafter "SDF"), ¶ 34)).[12]  This is sufficient to es-

tablish a dispute of fact as to whether Mr. Bibbo received an orientation at all and whether any

orientation that defendants argue they gave Mr. Bibbo adequately complies with the DOC's duty

to provide an orientativon explaining the grievance procedure under 103 C.M.R. § 491.05.   In

support of their motion, Defendants present only an unexplained exhibit that does not establish

the contents of the purported orientation.[13]  Moreover, the exhibit does not explain why this "ori-

entation" did not take place until more than six months after Mr. Bibbo was admitted to MCI-

Shirley when non-disabled inmates receive one upon arrival at the institution before they are re-

leased into the general population, whether and how prison grievance procedures were explained

to Mr. Bibbo, and whether this separate orientation that Defendants allege was conducted by

Stan Ferrebee (who has not provided an affidavit regarding his role at the prison or his training)

meets the requirement of 103 C.M.R. § 491.05 to provide an orientation when non-disabled in-

mates receive a daylong orientation presented through various videos and different speakers.[14]

Defendants' motion for summary judgment on this issue is premature and the one exhibit

they have presented is insufficient to establish that Mr. Bibbo was given an orientation as re-

quired by the regulations they seek to enforce under the PLRA.  But even were this not so, Mr.

---

[12] Mr. Bibbo previously submitted a signed affidavit stating that he was never given an orientation prior to Defen-
dants ever raising the issue of exhaustion in this motion.(Bibbo Aff., Ex. 1, at ¶¶ 12–16).

[13] Mr. Bibbo is entitled to discovery to probe these gaps and inconsistencies.  He has concurrently moved under
Fed.R.Civ.P. 56(f) arguing that this summary judgment is premature given that Defendants have not yet answered
the Complaint, discovery has just commenced, and Mr. Bibbo first learned that Defendants contend he received an
orientation in the context of their motion for summary judgment which was filed before they have filed an Answer.

[14] Defendants also assert that their failure to give Mr. Bibbo an orientation is itself excused because he later at-
tempted to file grievances, and referred to an "inmate handbook" in one of the grievances. (Defendants' Brief, at 9).
Defendants' argue that this somehow shows that either Mr. Bibbo did not need an orientation or actually received
one. Either assertion is incorrect.  Mr. Bibbo was never given an orientation and the grievance procedure was never
explained to him.  (Am. Compl., ¶¶ 59–62; Bibbo Aff., ¶ 2). Instead, he was left stumbling in the dark, relying on
advice he received from time to time from other inmates. (Bibbo Aff., ¶ 7) Likewise, Mr. Bibbo's reference to the

Bibbo, without the benefit of discovery, has submitted sufficient facts to create a dispute of fact regarding the issue of whether he received an orientation explaining the grievance procedures and whether such a failure should estop Defendants from requiring exhaustion under the PLRA. Defendants have thus failed to carry their burden of proving a failure to exhaust under the PLRA.

## II.   MR. BIBBO HAS SUFFICIENTLY ALLEGED VIOLATIONS UNDER THE ADA AND RA

Defendants argue that Mr. Bibbo has "failed to establish" that defendants violated his ADA/RA rights. Defendants correctly state the legal standard that Plaintiff has to meet to survive a motion to dismiss on an ADA/RA claim, which is that "plaintiff must allege, (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefit of some public entity's services, programs or activities, or was otherwise discriminated against; and (3) that such an exclusion, denial of benefits, or discrimination was by reason of his disability." (Defendants' Br., at 10–11) (emphasis added) (citing *Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 5 (1st Cir. 2000)).[15]

Having stated the standard, however, Defendants proceed to ignore it. Instead, they indulge in a long, deeply factual arguments about whether letting Mr. Bibbo use his own electric wheelchairs is in fact a "reasonable accommodation" under the ADA and RA and whether he is

---

"inmate handbook" does not indicate that he knew about the DOC's grievance procedures. (*id.*) He cited it only for the rules regarding visitors, and that only because another inmate helpfully told him that it contained such rules (*id.*)

[15] There can be no serious question that Mr. Bibbo has alleged each of these elements with respect to each of his claims in his Amended Complaint: he has done so explicitly, repeatedly and with a wealth of supporting factual detail. Defendants do not contest that Mr. Bibbo is a qualified individual with a disability. (Defendants' Br., at 11). As for the other two factors, Mr. Bibbo has alleged discrimination and exclusion from prison facilities, benefits and programs by reason of his disability repeatedly and with detailed factual support. *See* Am. Cmplt, ¶¶ 18–38 (exclusion from various prison programs and facilities based on failure to make reasonable accommodation of letting Mr. Bibbo keep his own electric wheelchair); ¶¶ 19–52 (corresponding discriminatory exclusion from prison job); ¶¶ 53–63 (discriminatory exclusion from prison orientation based on his disability). *See also id.*, ¶¶ 64–109 (counts). See also n. 8, *supra*, rebutting Defendants' argument that Mr. Bibbo has failed to properly plead his case because he has "fail[ed] to identify what wrongful actions each defendant took." (Defendants' Br., at 10).

actually denied access to, or the benefit of, prison programs and services. This is entirely inap-

propriate at this early stage of the proceedings — before defendants have even answered the

complaint, and before discovery. (See Plaintiff's accompanying Rule 56(f) motion). Conse-

quently, the court should reject these premature arguments.  Nevertheless, even without the bene-

fit of discovery, Mr. Bibbo can adduce sufficient disputed facts to rebut each argument. Once

discovery is complete, and he has obtained the additional evidence he is entitled to, Mr. Bibbo

will himself move for summary judgment.

### A.    The accommodations Mr. Bibbo seeks are reasonable

#### 1.    Mr. Bibbo clearly requested an accommodation under the ADA/RA

Defendants first argue that Mr. Bibbo failed to notify them that he needed his electric

wheelchairs as a reasonable accommodation under the ADA and RA.[16]  The record clearly shows

otherwise.  Mr. Bibbo specifically told the DOC, through its employee Scott Anderson, that he

needed an electric wheelchair to access the prison's facilities orally and in writing on at least

seven different occasions and Mr. Anderson specifically replied to most of the written requests.

(SDF, ¶ 49).  These documents include: (1) a grievance forwarded to Mr. Anderson, wherein Mr.

Bibbo stated that the replacement manual wheelchair "never really suited [his] needs," and asked

Defendants to "giv[e] [him] back [his] own personal ele[c]tric wheelchair" (*id.*); (2) two "Re-

quest for Reasonable Accommodation of Special Need(s)" forms (countersigned by Mr. Ander-

---

[16] *Shedlock v. Dep't. of Corr.*, 442 Mass. 844 (2004), held that prison officials' duties under the ADA and the RA are triggered only when a prisoner "articulate[s]" his need for an accommodation, or otherwise gives them some "way of knowing" that he needs one. 442 Mass. at 856–57. However, "[t]his knowledge may derive from an individual's request for an accommodation, [or] . . . follow from the entity's knowledge of the individual's disability and his . . . attempt to participate in . . . a certain service." *Robertson v. Las Animas County Sheriff's Dept.*, 500 F.3d 1185, 1197 (10th Cir. 2007) (collecting and analyzing cases). So, for example, "[w]hen a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim." *Id.* Thus, a deaf inmate may sufficiently have notified the prison of his deafness by "plac[ing] a note in the slot of the cell indicating that he wanted to call his attorney, despite the availability of a phone in his pod," *id.*. at 1198.

18

son), in which Mr. Bibbo "describe[d his] special need," as "a ele[c]tric wheelchair," and stated in response to the question "[h]ow does your special need limit your daily activities" that "I . . . need a ele[c]tric wheel chair to get around the institution." (*id.*); (3) four letters written on Mr. Bibbo's behalf by a lawyer from Massachusetts Correctional Legal Services, to Scott Anderson, explaining that "Mr. Bibbo's disabilities require that he [] have access to his electric chair in order to be able to perform the most basic activities of daily living," that an electric wheelchair is a "necessary accommodation" for his condition, and that, without a functioning electric wheelchair, Mr. Bibbo cannot travel "for long distances, such as to the law library or to programs," and which asked Mr. Anderson to "return it to [Mr. Bibbo]." (*id.*); and (4) a letter from Mr. Bibbo to Defendants, explaining that, without a functioning electric wheelchair, he "is unable to access the library or any programs or other services that require travel outside the [HSU or] … to reach outside destinations [, and he is] therefore den[ied] … access to [the library and such programs] due to his disability." (*id.*) It is clear that Defendants were aware of Mr. Bibbo's request for a reasonable accommodation because Mr. Anderson in a reply to the last letter acknowledged Mr. Bibbo's concerns that he was "being denied access to facility destinations due to his disability," and promised that "the Department of Correction will ensure reasonable accessibility to all areas of the facility." (*id.*)

Mr. Bibbo has similarly requested a reasonable accommodation for a job. (SDF, ¶ 31)

> **2.** Based only on the evidence ***already*** produced by Mr. Bibbo, there is a clear factual dispute precluding the entry of summary judgment regarding Mr. Bibbo's need for an electric wheelchair.

Defendants argue that Mr. Bibbo does not medically require an electric wheelchair while he is housed in the HSU. As discussed above, summary judgment is totally inappropriate before defendants have even answered and when the discovery has not yet closed. Nonetheless, Mr.

19

Bibbo has already produced solid and substantial evidence of his medical need for an electric wheelchair creating a clear dispute of fact precluding entry of summary judgment. (See SDF, ¶ 16). Specifically, two doctors, a physical therapist, Mr. Bibbo's treating physician, and Mass-Health have all that determined that Mr. Bibbo medically requires an electric wheelchair to ambulate.[17] For their part, Defendants have produced conclusory affidavits from Sharon Cullen, a physical therapist, and Maria Angeles a doctor at the prison that conclude using identical language that a manual wheelchair is perfectly adequate for Mr. Bibbo while he is housed in the HSU. (Angeles Aff., ¶¶ 5, 6, 8; Cullen Aff. ¶¶ 15–17). Defendants' affidavits are not only conclusory but also contain many troubling gaps and inconsistencies, which Mr. Bibbo is entitled to probe during the discovery process.[18] For instance, they state that the critical questions of <u>when</u> and <u>why</u> a "medical" decision was made to take away Mr. Bibbo's wheelchair — after he had used one at the prison with medical approval for more than three years — was made after an evaluation at a physical therapy session on May 13, 2008. (Cullen Aff., ¶ 6 ("On May 13, 2008, "Mr. Bibbo was evaluated in order to assess his wheelchair needs. In accordance with that evaluation, Mr. Bibbo subsequently was provided with a manual wheelchair by UMCH.")). But

---

[17] In 1999, Dr. Thomas E. Hare, a Staff Physician at the Federal prison in Springfield, Missouri, determined after two single-spaced pages of detailed medical analysis that Mr. Bibbo needed an electric wheelchair, "because of his inability to use one upper extremity." (SDF, ¶ 16). Similarly, on January 28, 2003, Mr. Bibbo underwent a "Rehabilitative Medicine Evaluation," by Dr. Daniel Lyons who noted that the "Quickie P-100" electric wheelchair Mr. Bibbo was using was too old and that he should be referred to a wheelchair/seating clinic to get a "more appropriate community level wheelchair" which was ultimately determined to be an Invacare electric wheelchair (*id.*). Mr. Bibbo was then seen by a physical therapist at the Wheelchair/Seating Clinic of the New England Rehabilitation Hospital, which specializes in the specific wheelchair needs of disabled individuals, who concluded after a thorough evaluation in a signed Note that Mr. Bibbo needed "power w[heel]c[hair]" for "Preparation/Propulsion" as well as for "Community Mobility" (*id.*) and recommended that he be given an Invacare Torque electric wheelchair. (*id.*). On March 12, 2003, Mr. Bibbo asked his treating physician, Dr. Dennis Markovitz, for a "letter of medical necessity in order to get an electric wheelchair." (*id.*). Dr. Markowitz wrote such a letter and sent it directly to MassHealth, which then paid for Mr. Bibbo's electric wheelchair as a medical necessity. (*id.*). Finally, MCI-Shirley medical authorities also apparently subscribed to the uniform medical opinion that Mr. Bibbo needed an electric wheelchair, because they let him use one for over three years in the prison without demur.

[18] In addition, Mr. Bibbo is entitled during discovery to seek a new medical evaluation from an independent doctor.

the responses to Mr. Bibbo's § 12:00 grievances, discussed in Section I.A.1, *infra*, dated January 18, February 29, and March 16, 2008, respectively, each state that the decision that Mr. Bibbo did not need an electric wheelchair had already been made." (SDF, ¶ 53; Bibbo Aff., Ex. 4, 5. 6). Similarly, the Cullen and Angeles' Affidavits contend that an electric wheelchair is less beneficial to Mr. Bibbo than a manual one because it gives less "exercise to his left arm and wrist" (Cullen Aff., ¶ 16; Angeles Aff., ¶ 6) and that the medical authorities endorse giving him a <u>one-arm drive</u> wheelchair to use instead.[19] But a one-arm drive, which Mr. Bibbo would use with only his good right hand, gives no more "exercise to his left arm and wrist" than an electric wheelchair. These inconsistencies and gaps call into question whether Defendants' medical affidavits are sufficient to establish the facts they are offered to prove and, in any regard, Mr. Bibbo is entitled to probe these inconsistencies during discovery.

Despite the clear dispute of fact on this issue, Defendants appear to argue that their medical affidavits are not just evidence for the fact-finder to consider in determining whether Mr. Bibbo's use of his own electric wheelchairs is a "reasonable accommodation," but rather the only evidence the Court should consider.[20] Defendants cite to *Knox v. Sabourin*, No. 07-12344-GAO (D. Mass. September 25, 2009) but it provides them no support. *Knox* also involved ADA claims by a prisoner against Scott Anderson, and a conclusion by Maria Angeles "that [the requested accommodation] was not medically required." *Id.,* *10. At summary judgment, the court dismissed plaintiff's claims, not because Angeles' pronouncements trumped any other evidence or could not be challenged by other medical evidence, but rather "[b]ecause [plaintiff had] of-

---

[19] *See, e.g.*, Cullen Aff., ¶¶ 7–8 (discussing Ms. Cullen's willingness to "accommodate Mr. Bibbo's requests" for a one-arm drive wheelchair).

[20] According to Defendants, "prison administrators are entitled to rely entirely upon the recommendations of medical personnel," to establish that "defendants have not violated plaintiff's [ADA] rights." (Defendants' Br., at 14).

fer[ed] no evidence (other than his own opinion) that the accommodations not approved were medically necessary . . ." *Id.*, *10–11 (emphasis added). In other words, plaintiff could have offered medical evidence that the "accommodations not approved" by defendants' doctors were medically necessary.[21] Mr. Bibbo has already offered testimony from four medical professional disputing Defendants' evidence, even though summary judgment in this case is premature.

The present case is more analogous to *Stringham*, 2007 WL 60996 (E.D.Cal. 2007), which identifies the error of Defendants' reasoning.  In *Stringham,* a state prisoner who suffered from "brittle diabetes," which rendered him extremely sensitive to bright light filed suit. 2007 WL 60996, at *1. As in this case, plaintiff had used a certain accommodation for his disability (a cell with tinted windows) for a number of years in the prison that defendants then suddenly deprived him of it. *Id.* Like Mr. Bibbo, plaintiff sued for an injunction that the accommodation (tinted windows) be restored to him (among other things). *Id.* Defendants responded with an affidavit from a prison medical officer, who gave two "medical opinion[s]" that a different accommodation (dark glasses) was adequate to meet the plaintiff's needs, and that this other accommodation was in fact "a superior [accommodation]." *Id., *7. Like the case at bar, plaintiff then submitted his <u>own</u> medical testimony, e.g., *id.*, *2, and argued that the proposed alternative accommodation was in fact <u>insufficient</u> (because dark glasses let in an "intolerable" amount of "peripheral light"). *Id.*, *3.  Faced with these facts, far from dismissing the case based on the existence of the prison's  "medical opinion," as Defendants urge here, the *Stringham* court instead

---

[21] Defendants citation to *Olmstead v. Zimring*, 527 U.S. 581 (1999) does not support their position either. Defendants' quote the section of the opinion discussing the standard that public entities can use to control "whether an individual 'meets the essential eligibility requirements' for . . . [a] program." 527 U.S. at 602 (in other words, to choose whom they will open their programs to) rather than the question of what constitutes a reasonable accommodation for those eligible (as Mr. Bibbo is for all prison programs). The latter question, which <u>is</u> relevant here, is the

reviewed the medical evidence and found defendants' evidence wanting, *see id.*, * 7, 14 (defendant's medical officer "does [not] speak to the issue raised by plaintiff that the dark glasses cannot be properly placed over his prescription glasses [and therefore let in too much peripheral light]" and does not "answer[] the issues plaintiff has raised with respect to his medical need for window tinting.") The court then issued a preliminary injunction in plaintiff's favor, finding that "defendants do not . . . make any adequate showing as to why plaintiff . . . who <u>for several years</u> was allowed cell housing with window tinting for his [illness] . . . has been removed from such housing, when his medical condition is unlikely to have improved over those years, and, indeed, is likely to have deteriorated," *id.*, *13.

**3.**     <u>There is more than sufficient evidence that Defendants are unreasonably refusing to accommodate Mr. Bibbo's disabilities.</u>

Defendants contend that it is undisputed that the reasonable accommodations Mr. Bibbo seeks will burden the Defendants.  In discussing what is "reasonable" in the prison context, the Supreme Court has noted the danger that prison officials might "exaggerate[]" the role of "security concerns," and has pointed to "the existence of obvious, easy alternatives" to the prison's actions as possible evidence of such unreasonable exaggeration. *Turner v. Safley*, 482 U.S. 78, 90–91 (1987). This is precisely what defendants are doing here. It costs the Defendants nothing to let Mr. Bibbo use his personal electric wheelchairs — indeed, it would free up a manual wheelchair for other inmates — and it would allow him the equal access to prison facilities and services that he is guaranteed under the ADA and the RA. Mr. Bibbo's family has even agreed to pay for his batteries and wheelchair upgrades in the future, as they have done in the past (Bibbo Aff., Ex. 3, ¶ 43). Likewise, Defendants' unidentified "security concerns" (Defendants' Br., at 15) seem

---

subject of an entirely different section of the opinion, *Id.*, 603–06, that does not remotely suggest that special defer-

baseless and "exaggerat[ed]," given that Mr. Bibbo has used his electric wheelchairs for nine years in two prisons — including for three years at MCI-Shirley itself — without his wheelchair causing a single security incident. Defendants' fear that "other inmates [will] demand the wheel-chair of their choice," (*id.*) is similarly a non sequitur.  Mr. Bibbo has not requested that Defen-dants purchase him an electric wheelchair.  Instead, he is arguing that it is a reasonable accom-modation to allow him to use the electric wheelchairs he already owns and are house in the prison to access the prison's programs and benefits.  Finally, giving Mr. Bibbo the orientation that all inmates are entitled to and the good-time credits he lost through discrimination in the job-assignment process would similarly incur no monetary expense on Defendants' part.

**B.** **Based only on the evidence** *already* **produced by Mr. Bibbo, there is a clear fac-tual dispute precluding the entry of summary judgment regarding whether Mr. Bibbo has been denied participation in or the benefit of prison programs, ser-vices and activities in violation of the ADA and RA.**

Defendants argue that Mr. Bibbo has not been denied participation in, or the benefits of, prison programs, services and activities. (*id.*, at 15–19). Despite the fact that summary judgment in this case is premature given that the Defendants have not even answered and discovery is not yet closed, Mr. Bibbo has already produced significant evidence and a wealth of factual detail showing that he has been denied such benefits.

Defendants assert that they have no further obligation under the ADA and RA because Mr. Bibbo can use a manual wheelchair to ambulate within the freestanding HSU building where he is housed. Almost all the MCI-Shirley programs and services  that Mr. Bibbo seeks to access are located at a distance from the HSU in other buildings, such as the Programs Building, the School Building, the Vocational Educational Building, the Prison Gym, the Visitors' Building,

---

ence is due to any "medical opinions" a defendant might procure.

and the prison's General Yard (SDF, ¶ 24). Mr. Bibbo has produced evidence that all of these buildings are too far for him to push himself in a manual wheelchair using his one good arm,[22] and that several of them — specifically, the Programs, School, and Visitors' Buildings — are accessed by long ramps, which he is not strong enough to climb in a manual wheelchair.[23] (*id.*)

Without an electric wheelchair, Mr. Bibbo would be denied access to numerous programs and benefits that non-disabled inmates can use independently, every day (*id.*). For instance, Holy Catholic mass and confession are only provided in the Programs Building as Catholic priests do not visit the HSU. (*id.*). Self-help programs which take place in the Programs Building and classes that are conducted in the School Building are similarly unavailable to Mr. Bibbo in a manual wheelchair. (*id.*).[24] The prison's General Library and Law Library which are housed in the School Building and the CRA Academy and the prison barbershop which are housed in the Vocational Building are also not accessible to Mr. Bibbo without an electric wheelchair.[25] (*id.*). Mr. Bibbo cannot also access the prison gym or the Prison General Yard in a manual wheelchair. (*id.*). Because non-disabled inmates never come to the HSU yard, lack of access to the General

---

[22] The medical Note that memorializes the first time Defendants gave Mr. Bibbo a manual wheelchair with protrusions to use in place of his electric wheelchair also states that he would need someone to push him if he wanted to access any facilities outside the HSU. It states that: "inmate instructed in self propelling w[ith]in HSU + a w[heel]c[hair] helper/pusher will be available for longer distances outside HSU." (Cullen Aff., Ex. B-1, note dated 10/07/08). Mr. Bibbo has never been assigned a pusher. (SDF, ¶ 25).

[23] Defendants have provided no evidence to dispute the fact that that Mr. Bibbo has never been able to get to these buildings on his own in a manual wheelchair with protrusions. (SDF, ¶24) In fact, Defendants' own evidence demonstrates that Mr. Bibbo's cannot use a manual wheelchair as it is designed to be operated to access even the shallow divided ramps of the HSU. (SDF, ¶ 34)

[24] Since the TRO issued and Defendants returned Mr. Bibbo's electric wheelchair, he has already attended two self help programs in the Programs Building, *Health Awareness and HIV Aids* and *Alcoholics Anonymous*, and has signed up for others, including drug-recovery, job-skills, and anger- and money-management programs. (Bibbo Aff., Ex. 3, ¶ 8) He has also attended three other classes or programs in the School Building: the "Four Agreement" class, the "Smart Recovery" program, and the Veteran's Group. (Bibbo Aff., Ex. 3, ¶ 14)

[25] Since he got his electric wheelchair back, Mr. Bibbo has applied to join the CRA Academy (which carries good-time credits to reduce his sentence), and has used the barbershop's services, which are available to non-disabled inmates and include haircuts, shaves, and massages. (SDF, ¶ 24) Full barber services are unavailable at the HSU. (*id.*).

Yard effectively kept Mr. Bibbo segregated among disabled inmates. (*id.*) Mr. Bibbo similarly needs an electric wheelchair to see visitors at the Visitors' Building.  In the past, he has had to beg for help from passers-by to get there and back (*id.*).  Finally, Mr. Bibbo has presented evidence that an electric wheelchair allows him to compete for a prison job (*id.*, ¶ 27).  Indeed, soon after Mr. Bibbo got his electric wheelchair pursuant to this Court's TRO, he was given a job doing maintenance work.(*id.*, ¶ 33).[26]

### C.   Mr. Bibbo has standing to bring Count IV of his Amended Complaint

In Count IV of his Amended Complaint, Mr. Bibbo challenges Defendants' "policy of not assigning prison jobs to wheelchair-bound inmates because of their disabilities, even though they are capable of performing many prison jobs." (Am. Compl., ¶ 95) Defendants assert that Mr. Bibbo is thereby seeking to "bring the claims of others." (Defendants' Br., at 22). This is incorrect. Mr. Bibbo is merely challenging a policy under which he himself has suffered concrete harms — discriminatory deprivation of a prison job (and the chance to compete therefor), along with a loss of income and good-time credits. Plaintiffs have standing to challenge policies that have caused them actual harm, even where the harm is much less concrete than Mr. Bibbo's. *See, e.g., Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (plaintiff had standing to challenge a public university's allegedly discriminatory admission policy when he was "able and ready" to apply as a transfer student should the University cease its policy, but had not actually done so).

Count IV of Mr. Bibbo's complaint is also distinct from Count III. In Count IV, Mr. Bibbo challenges a discriminatory policy that injured him. In Count III he challenges a particular decision that Defendants made — namely, to deprive him of a job on the basis of his disability —

---

[26] This does not moot Mr. Bibbo's job-discrimination claims because he can only do a job in an electric wheelchair and his new job does not restore to Mr. Bibbo the good-time credits he lost through Defendants' past discrimination.

that also injured him. Of course, it may be that the policy played some part in the decision, along with other factors (although Defendants have not yet admitted this), but both independently violate the ADA and the RA, and Mr. Bibbo is entitled to challenge both.

Dated: January 26, 2010.

    */s/ Maria Raia Hamilton*
Maria Raia Hamilton, BBO # 554798
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 521-7856
Facsimile: (617) 542-8906

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing **PLAINTIFF'S OPPOSITION TO DE-FENDANTS' MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT** filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 8th day of January 26, 2010.

Dated: January 26, 2010

    */s/ Maria Raia Hamilton*
Maria Raia Hamilton, BBO # 554798
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110-2804
Telephone: (617) 521-7856
Facsimile: (617) 542-8906